**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| LIBERTARIAN NATIONAL, COMMITTEE INC., <br><br> Plaintiff, <br><br> v. <br><br> LIBERTARIAN PARTY OF NEW MEXICO, et al, <br><br> Defendants. | CIVIL ACTION NO.: <br> 1:26-cv-01562-MIS-KK |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION**

## I.      INTRODUCTION

Plaintiff Libertarian National Committee, Inc. (LNC) asks this Court to forbid an established New Mexico political party from calling itself by the name it has used *continuously in this State since 1972*, as a backdoor to controlling which candidates may present themselves to New Mexico voters as "Libertarian." That is not trademark enforcement. It is an attempt to enlist a federal court as a referee of political competition and a gatekeeper of the New Mexico ballot.

The motion should be denied for independent reasons. *First*, the LNC cannot show a substantial likelihood of success because its entire theory rests on a license that it has never produced and that Defendants never signed or accepted. The "terminated affiliate" cases on which the motion depends all presuppose an actual license; the LNC offers none.

1

*Second*, the LNC's own evidence shows that for more than fifty years it has permitted state and county organizations across the country to call themselves the "Libertarian Party" of their jurisdictions. If there were no licenses, the mark is weak and its source significance diluted by pervasive independent use; if there were licenses, the LNC's total absence of quality control raises an abandonment dispute. Either way, the LNC cannot show a substantial likelihood of success.

*Third*, "Libertarian Party" is contested as the generic name for a type of political party rather than the brand of a single source.

*Fourth*, the Libertarian Party of New Mexico (LPNM) is, on the LNC's own documents, an independent senior user of its name in New Mexico, having organized and run candidates in New Mexico continuously since 1972—before the national organization had any presence in this State.

*Fifth*, the LNC's confusion evidence is thin, partly inadmissible, and, where it exists at all, traceable to the LNC's own decision to create a second, differently named "Libertarian"-affiliated entity in New Mexico.

And *sixth*, the balance of harms and the public interest weigh decisively against an extraordinary, election-eve injunction that would confuse voters, disrupt candidates who are not parties to this suit, and override the State's administration of its own ballot.

At a minimum, the licensing, abandonment, and genericness questions are genuinely disputed and turn on facts within the LNC's exclusive possession. The Court should not grant the "extraordinary remedy" of a preliminary injunction on this record. If the Court is inclined to consider the merits further, it should permit the limited expedited discovery in Defendants' accompanying request before any injunction issues.

## II.    RELEVANT BACKGROUND

### A.    LPNM Has Used Its Name in New Mexico Since 1972.

LPNM ran Libertarian candidates in 1972, was founded as an organized association on June 27, 1972, and held its first convention on July 22, 1972. *See* Luchini Decl at ¶ 4 (LPNM history). On July 26, 1972, LPNM filed its rules and regulations with the New Mexico Secretary of State, which the New Mexico Attorney General approved on July 31, 1972; the Secretary of State certified "the Libertarian Party of New Mexico" and its emblem as filed in that office. *See* Plaintiff's Exhibit 7 (Secretary of State Certificate, Aug. 8, 1972). LPNM has operated under that name in New Mexico continuously ever since. *See* Luchini Decl at ¶¶ 5-7.

### B.    The LNC's Own Records Show It Had No New Mexico Presence in 1972.

The LNC claims first use of "Libertarian Party" in January 1972. But the historical materials the LNC itself submitted tell a different story. The LNC's own newsletter, dated March 1972 and headed "Libertarian Party / National Headquarters" in Westminster, Colorado, reports that the national organization then had State Chairmen in only five States—Colorado, Oklahoma, Texas, Utah, and Wyoming—and was actively soliciting volunteers to organize chapters elsewhere. *See* Harlos Decl., Ex. A. The LNC's "Year One" retrospective states that the party "will be one year old" on December 11, 1972, and lists the States with members as of late 1972 without including New Mexico. *See* Harlos Decl., Exh. B. The LNC's evidence confirms that, when LPNM organized and filed in New Mexico in mid-1972, the national organization was a fledgling, Colorado-based entity with no presence in this state.

3

### C.    The LNC Has Not Produced a License to LPNM.

The LNC asserts that it "licenses the use of the Trademark to its officially recognized state level affiliates . . . pursuant to its bylaws." Harlos Decl. ¶ 7. The bylaws attached to the Complaint are adopted 2024 (two years after LPNM confirmed disassociation), and the LNC produces no license agreement with LPNM, no 1972-era document granting LPNM permission to use the name, and no evidence that LPNM ever agreed to be bound by any licensing provision. The LNC's evidence of "affiliation" and of a 2022 disaffiliation says nothing about a trademark license; *it describes the severing of a voluntary political association.*

### D.    The LNC Created the Confusion It Now Complains Of.

After the 2022 disaffiliation, the LNC chartered a separate New Mexico organization that was required to register under a different name—the "Free New Mexico Party." The LNC's own (and thin) evidence describes voters who were confused because they did not understand that this new, differently named entity—not the long-established LPNM—was the national organization's New Mexico affiliate. Konsavage Decl. ¶¶ 5–6. That confusion is a product of the LNC's decision to inject a second "Libertarian"-affiliated organization into New Mexico under an unfamiliar name, not of LPNM's continued use of the name it has held since 1972.

LPNM, for its part, now expressly disclaims any affiliation with the LNC. The LNC's own exhibit shows LPNM's website carrying the notice that "the Libertarian Party of New Mexico has no connection or affiliation with the Libertarian National Committee and/or LP.org," and shows that LPNM removed the historical "state affiliate" reference the LNC complains about. *See* Scott Decl. Ex. 2-F at 11–12.

4

## III.    ARGUMENT

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). In the Tenth Circuit the movant must establish: (1) a substantial likelihood of success on the merits; (2) irreparable injury absent the injunction; (3) that its threatened injury outweighs the harm the injunction would cause the opposing party; and (4) that the injunction is not adverse to the public interest. *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). Where, as here, the requested injunction would alter the status quo and effectively grant the movant the ultimate relief it seeks, the request is "disfavored" and the movant must make a "heightened" showing. *O Centro Espírita Beneficente União do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc) (Such preliminary injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course"). The LNC cannot make the ordinary showing, let alone a heightened one.

### A.    THE LNC SEEKS TO CONTROL THE NEW MEXICO BALLOT AND THE INJUNCTION IMPACTS THE RIGHTS OF NON-PARTIES.

Although styled as a trademark case, the relief the LNC actually seeks is an order forbidding an established New Mexico party from identifying itself to voters as "Libertarian" as candidates prepare to appear on the ballot. They are explicit about this: their asserted urgency is "the rapidly approaching . . . nomination and election of federal and state candidates" and the desire to control how "candidates appear correctly on ballots." Mot. For Expedited Preliminary Injunction Hearing at p.1 & Exh. 1. The LNC Chair's declaration also confirms the true stakes: it

5

complains that the national organization's New Mexico affiliate "was forced to register as the 'Free New Mexico Party,'" and that the LNC "was forced to spend $45,000 on ballot access." McMahon Decl. at ¶ 6.

This is a dispute about ballot designations and the costs of ballot access, recharacterized as trademark harm. That recharacterization cannot support the injunction for several reasons.

### 1.    The relief would both bind and harm non-parties.

A candidate's party designation on a New Mexico ballot is a function of state election law, the candidate's own choice, a party's nominating procedures, and voter support via registration, vote totals, and petitioning (to ensure party recognition and ballot access). *See* N.M. Stat. Ann. §§ 1-8-1, 1-8-2 (1978) (New Mexico's election code on the nomination and ballot access for minor parties' and their candidates). It is not a function of the LNC's licensing decisions. The candidates who intend to appear as Libertarian, the New Mexico Secretary of State who administers the ballot, and the registered Libertarian voters of New Mexico are not parties to this case.

An injunction barring LPNM from using its own name would force it to withdraw its registration as a party with the Secretary of State—a party cannot register and maintain ballot status under a name a federal court has forbidden it to use. That deregistration collapses the ballot line on which every New Mexico Libertarian candidate depends, *forcing them to file as independents, seek another party's nomination, or abandon their candidacies altogether*. That cascading effect on candidates and voters who are not before this Court is precisely why the relief is improper under Federal Rule of Civil Procedure 65(d)(2), and why it confirms the LNC's true aim is at the conduct and legal and constitutional rights of non-parties.

6

**2.      LPNM Does Not Use the Name to Designate the LNC as Its Source, and the First Amendment Protects Its Political Identity.**

Plaintiffs rely on their Sixth Circuit case in *Libertarian Nat'l Comm., Inc. v. Saliba* as their primary authority. But unlike in *Saliba*, the dispositive question here is not whether a political party performs "services" in the abstract, but whether LPNM uses the name to designate the LNC as the source of those services. It is use of a mark "as a source identifier" that implicates "the core concerns of trademark law" and permits the Act to operate in the political sphere. *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 157 (2023); *see also Libertarian Nat'l Comm., Inc. v. Saliba*, 116 F.4th 530, 538–39 (6th Cir. 2024) (extending the Lanham Act into the political arena only in the "narrow context" in which a defendant uses the mark "as a source identifier").

In *Saliba*, an off-shoot faction held itself out as the official state party, "us[ing] the mark to designate the source of their political services as affiliated with the LNC." *Saliba,* 116 F.4th at 538. The Libertarian Party of Michigan had an affiliate agreement and license in place, and the defendant faction was not a signatory to those agreements, but rather competing with them.

LPNM is the opposite. As the *senior independent user* of its own name in New Mexico *since 1972*, and as an organization that now expressly disclaims any connection with the LNC, LPNM uses the name to *identify itself*—not to suggest the "same source identification" as the national organization. *Cf. Saliba*, 116 F.4th at 539. Where the defendant is not passing itself off as the registrant, the source-identification predicate that *Saliba* and *Jack Daniel's* require is absent, and the use remains "outside the jurisdiction of the Lanham Act and necessarily protected by the First Amendment." *Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003) (*quoting* 15 U.S.C. § 1114(1)).

Independent of source identification, the name of a political party is the central vehicle of political association and expression, and the First Amendment freedom of association protects a party's determination of its own identity. *See Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214–15 (1986). A court should therefore be especially reluctant to convert the Lanham Act into a tool for resolving which faction may claim a political label, particularly where—as here, and unlike in *Saliba*—there is no accepted license to terminate, no passing off, no off-shoot violating an established license, and the asserted "use in commerce" comprises soliciting contributions and nominating candidates, which are quintessentially expressive political activities.

3.      **Federal courts should not interfere with an imminent election.**

Court changes of election laws close in time to the election are strongly disfavored. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam) ("This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election.") *citing Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam). The LNC **waited years** to seek relief—alleging infringement "beginning in September of 2022," and now demands that this Court reorder New Mexico's ballot designations on an expedited basis days before the relevant nomination and election activities. The very urgency the LNC invokes is a reason for restraint, not intervention.

B.      **THE LNC IS NOT LIKELY TO SUCCEED BECAUSE IT CANNOT PROVE THE LICENSE ITS THEORY REQUIRES.**

To prevail on infringement the LNC must show (1) a protectable interest in the mark; (2) use of an identical or similar mark in commerce by Defendants; and (3) a likelihood of confusion.

*1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013). The LNC's motion collapses these elements into a single shortcut: it contends that LPNM is a former "licensee" whose license terminated in 2022, so that continued use is *per se* infringing. *See* Plaintiff's Mot. 9–10 (citing *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185 (6th Cir. 1997)). That shortcut fails at the threshold because the LNC has not shown that any license ever existed.

1. **The "Terminated Licensee" Cases Presuppose a License the LNC Never Produced.**

Every authority the LNC relies upon for its per se theory involved an actual license that the defendant had accepted. In *U.S. Structures*, the defendant was an express franchisee. 130 F.3d at 1188. In *U.S. Jaycees v. Philadelphia Jaycees*, 639 F.2d 134 (3d Cir. 1981), and *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187 (3d Cir. 1990), the local organizations had been chartered members bound by the national organization's rules. And the LNC's own Exhibit 5, *RNC v. Canegata*, turned on the defendants' concession that "an implied licensing agreement exists between them and RNC." The terminated-licensee rule is a rule about licensees. It says nothing about an independent user who never took a license.

Here, the LNC has produced no license to LPNM. It produced no signed agreement, no 1972 charter conditioned on trademark permission, and no evidence that LPNM agreed to the bylaws' licensing terms. In contrast, LPNM existed for nearly thirty years prior to the registered trademark and conducted operations for another twenty-five before this lawsuit. The LNC's assertion that affiliates are licensed "pursuant to its bylaws," Harlos Decl, ¶ 7, is a post hoc legal conclusion unsupported by any document showing that LPNM accepted such terms. On this record, the LNC cannot establish the predicate for its only colorable theory of success.

The LNC's reliance on *Saliba* underscores the point. The Sixth Circuit's analysis there rested on the Michigan affiliate's having been licensed and bound by the national bylaws' licensing procedures—and even then, the court preserved a carve-out for a donation page. *Id.* The key fact is missing here: a license that LPNM accepted.

2.    **LPNM Is an Independent Senior User of Its Name in New Mexico.**

Incontestability does not defeat a party who has continuously used a mark in a discrete geographic area before the registrant's use there. The Lanham Act expressly preserves the defense of a senior user who adopted the mark, without knowledge of the registrant's prior use, before the registrant's registration or use in that area. 15 U.S.C. § 1115(b)(5). As shown above, the LNC's own documents (Mot. Exh. 7) establish LPNM organized and filed in New Mexico on August 23, 1972, when the national organization had no New Mexico presence. *See* Harlos Decl, Exhs A-B. At a minimum, this creates a genuine dispute over priority in New Mexico that forecloses the "substantial likelihood" the LNC must show.

C.    **THE DECADES OF UNCONTROLLED, UNLICENSED USE WEAKEN THE MARK AND, AT A MINIMUM, RAISE A SERIOUS ABANDONMENT DISPUTE THAT DEFEATS "SUBSTANTIAL LIKELIHOOD."**

The LNC's theory confronts a dilemma of its own making. It contends that every state and county organization using the name "Libertarian Party" does so as its licensee. That contention is either false or fatal, and on this record the LNC cannot show a substantial likelihood of prevailing under either branch.

10

**1. If There Are Few Licenses—Despite Widespread Use—the Mark Is Weak and Its Source Significance Is Diluted.**

The LNC's own historical materials describe state organizations forming independently and a national office pleading for volunteers to organize chapters—not a licensor granting and superintending licenses. *See* Harlos Decl., Exhs. A-B. If, as those materials suggest and as Defendants believe, the state and county "Libertarian Part[ies]" have used the name for decades without any license at all, then the LNC's "terminated licensee" theory simply does not apply to LPNM, and the words "Libertarian Party" have long been used concurrently by many independent organizations across the country.

Widespread third-party use of a term is classic evidence the term is weak and entitled to a narrow scope of protection. *See Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1154–56 (10th Cir. 2013) (commercial strength of a mark narrows scope of protection). A mark that dozens of independent state and county political organizations have used for half a century carries little source-identifying force, and the likelihood-of-confusion analysis is correspondingly weak.

**2. Even If There Were Licenses, the LNC's Total Failure of Control Raises a Serious Abandonment Dispute.**

Alternatively, if the LNC insists these organizations were its licensees, then it was obligated to control the nature and quality of the activities conducted under the mark. A trademark owner who exercises no such control engages in "naked licensing" and may be deemed to have abandoned the mark. *Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 871 (10th Cir. 1995). The LNC identifies no quality-control mechanism, no inspection or approval process, and no enforcement of standards against any state or county party over the past half century, and it has

tolerated the use of "Libertarian Party of [State]" and "Libertarian Party of [County]" by organizations across the country for decades.

Defendants do not contend that the Court can or should declare the registration abandoned on this expedited record; abandonment is a fact-intensive question carrying a demanding burden of proof. *See Stanfield*, 52 F.3d at 871. But that is precisely the point. Plaintiff must show a *substantial likelihood* of success, and it cannot carry that burden where a serious, genuinely disputed abandonment defense turns on control and licensing facts within its own exclusive possession. A live abandonment dispute of this kind is itself a reason to deny the "extraordinary remedy" of a preliminary injunction and to permit the expedited discovery Defendants request.

Defendants Counsel's accompanying declaration provides direct evidence of the uncontrolled practice: as the former Chair of the Libertarian Party of San Diego County, she has personal knowledge that, at least at that time, neither the county nor state organization held or executed any license from the LNC to use the name "Libertarian Party," and that neither was subject to any LNC quality-control process. *See* Dearn Decl. ¶¶ 4–8. Combined with the Chair of LPNM's testimony that no licensing exists for their party, on Defendants' information and belief, that pattern has been, and remains, the national norm. The documents and testimony necessary to confirm this are within the LNC's exclusive possession, which is why Defendants have proposed the targeted, expedited discovery attached to the Dearn Declaration as Exhibits A through C.

**D.    "LIBERTARIAN PARTY" IS, AT MINIMUM, SERIOUSLY CONTESTED AS A GENERIC DESIGNATION FOR A TYPE OF POLITICAL PARTY.**

There is a further, independent reason the LNC is unlikely to establish a protectable exclusive right against LPNM: "Libertarian Party," taken as a whole, functions as the generic name

for a kind of political organization—a party of libertarian ideology—rather than as the brand of a single source. Genericness is assessed by reference to the term as a whole, but two generic terms are "nothing more than the sum of its parts." *Donchez v. Coors or Educational Development Corp.*, 392 F.3d 1211 (10th Cir. 2004).

"Libertarian" denotes a recognized political ideology—one whose use as a political term dates to the eighteenth century and that long predates any party that later adopted it—and "Libertarian Party" denotes a party of that ideological type, just as "Socialist Party," "Green Party," "Conservative Party," "Republican Party," and "Democratic Party," are name party-types and are not trademarked as single organizations, but rather signify shared political values. When a New Mexico voter hears "Libertarian Party of New Mexico," its primary significance is "organized libertarians in New Mexico," not "an entity licensed by a national committee."

That "Libertarian Party" was registered as a mark in 2001 does not serve as a bar to being challenged as a generic term. The Lanham Act expressly permits a generic term to be challenged or canceled at any time, including after incontestability. 15 U.S.C. §§ 1064(3), 1065; *see Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) (incontestable status does not protect a generic mark). The genus understanding is reinforced by the same record discussed above: the LNC's decades-long tolerance of many independent state and county "Libertarian Part[ies]" that it never licensed or controlled is exactly the kind of pervasive, independent usage from which the public comes to understand the whole phrase as a category rather than a single source.

Defendants recognize that a registered mark is presumed valid and that genericness ultimately turns on a developed record of public perception. Defendants do not ask the Court to cancel the registration now. The point for present purposes is narrower: the LNC cannot show a

13

*substantial likelihood* of overcoming a serious genericness challenge on this undeveloped record, particularly as applied to an independent state party using the ordinary name for a party of its kind. That unresolved question, like the abandonment question, weighs against granting extraordinary relief.[1]

### E.     THE CONFUSION EVIDENCE IS THIN, PARTLY INADMISSIBLE, AND LARGELY SELF-INFLICTED.

Even if the LNC could surmount the licensing and priority problems, its likelihood-of-confusion showing is weak. The Tenth Circuit weighs six nonexclusive factors, and several cut against the LNC here. *See Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972.

### 1.  Actual confusion.

The LNC's actual-confusion evidence consists of a few out-of-court statements offered for their truth—two social media comments and a single inquiry asking whether a person is "the LP chair for NM." Scott Decl. at Exhs C & D. These are hearsay and should not be credited. *See* Fed. R. Evid. 801, 802. More fundamentally, the confusion the LNC does identify was caused by the LNC. Its own witness explains that signers were confused because they did not realize the new, differently named "Free New Mexico Party"—rather than the long-established LPNM—was the national affiliate, requiring him to "explain, at length," the distinction. Konsavage Decl. at ¶¶ 5–6. Confusion manufactured by the senior complainant's own decision to field a second, similarly

---

[1] The authorities treating political and organizational names as protectable—including those collected in *Saliba*, 116 F.4th at 540–42 (e.g., *United We Stand* and *U.S. Jaycees*)—do not foreclose this defense, because none adjudicated a genericness challenge to the composite term itself; each presumed a protectable mark and litigated only confusion or authorization. The genericness of "Libertarian Party" as the name for a type of party remains an open, fact-bound question that this expedited record cannot resolve in the LNC's favor.

themed entrant with a different name does not support an injunction against the established prior user.

### 2.    Trade dress and distinctiveness.

Unlike in *RNC v. Canegata* (memorandum opinion attached as Plaintiff's Exhibit 5), where the parties used identical stylized logos, LPNM uses a distinct visual identity—a Zia-symbol porcupine in red and gold—that differs from the national organization's trade dress. The marks are not presented identically in the marketplace, and the term "Libertarian" is widely used by many independent organizations, diminishing its strength as a source identifier.

### 3.    Disclaimer.

LPNM already disclaims affiliation with the LNC on the very website pages the LNC submitted. Scott Decl. at Exh. F. A clear disclaimer is the established, narrowly tailored response to any residual risk of confusion; it is not a basis for banning a fifty-two-year-old party from using its own name. *Cf. Univ. of Kan. v. Sinks*, 565 F. Supp. 2d 1216, 1253-54 (D. Kan. 2008) (disclaimers as a measured remedy).

### F.    THE REMAINING FACTORS—IRREPARABLE HARM, BALANCE OF HARMS, AND THE PUBLIC INTEREST—FORECLOSE RELIEF.

#### 1.  No irreparable harm.

The statutory presumption of irreparable harm under 15 U.S.C. § 1116(a) applies only once the movant has shown likelihood of success, and it is rebuttable. The LNC has not made that threshold showing. Its own delay—alleging infringement since September 2022 but waiting until 2026 to seek emergency relief—rebuts any claim that the harm is immediate or irreparable. *See*

15

*Kansas Health Care Ass'n v. Kansas Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543–44 (10th Cir. 1994) (delay undercuts urgency).

Nearly four years have passed since LNC first complained of infringement. What has changed that makes the harm of June 2026 irreparable when it was not irreparable in September 2022 or 2023 or 2024 or 2025 or the first half of 2026? Nothing except the LNC wanting to wrest control over the New Mexico ballot last minute.

### 2.    Balance of harms.

By contrast, the harm to LPNM from an injunction would be immediate and severe: it would be barred from operating under the name it has used since 1972, mid-election, with cascading effects on its candidates, volunteers, trustees, and registered members. The LNC's asserted harm, by contrast, is the diversion of some donations and the cost of ballot access— quantifiable, compensable, and in any event the product of its own choice to create a competing New Mexico entity. The balance tips sharply against an injunction.

Because the LNC seeks a disfavored, status-quo-altering injunction that would hand it the ultimate relief it seeks, it must satisfy not the ordinary standard but a heightened one. *O Centro*, 389 F.3d at 975. An injunction that would force a fifty-two-year-old party off the ballot mid-election does not preserve the status quo; it destroys it. The LNC cannot meet the ordinary standard on any of the four factors, and it comes nowhere near the heightened showing this disfavored relief requires.

### 3.    Public interest.

The public interest is not served by a federal court effectively voiding a ballot designation that registered New Mexico voters rely upon, on an expedited record, weeks before an election.

16

*See Purcell*, 549 U.S. at 4-5. The public interest in orderly elections and in the free functioning of political association outweighs the LNC's interest in monopolizing a political label it has allowed others to use, uncontrolled, for half a century.

### G.    AT MINIMUM, THE COURT SHOULD PERMIT LIMITED EXPEDITED DISCOVERY BEFORE RULING.

The dispositive questions—whether LPNM was ever a licensee, and whether the LNC exercised any control over the use of "Libertarian Party" by state and county organizations nationwide—turn on evidence the LNC alone possesses. Courts routinely permit expedited discovery before resolving a preliminary-injunction motion where the relevant facts are in the movant's control and the requested relief is extraordinary. *See* Fed. R. Civ. P. 26(d)(1) (discovery at this phase of the case is permitted only by court order). Defendants have attached as Exhibits A through C to the Dearn Declaration targeted Requests for Admission, Interrogatories, and Requests for Production directed at the existence (or absence) of written licenses and affiliate agreements with, and any quality control over, every state and county Libertarian organization. Their answers will likely resolve the licensing, abandonment, and genericness questions efficiently and should precede any injunction.

### IV.    CONCLUSION

The LNC seeks a disfavored injunction that would alter, not preserve, a fifty-two-year status quo and grant the LNC the backdoored relief it seeks to control the New Mexico ballot— relief it has not justified under the ordinary standard, much less the heightened one that governs here. Defendants respectfully request that the Court deny Plaintiff's Motion for Preliminary

Injunction, or in the alternative defer ruling and permit the limited expedited discovery set forth in

Defendants' accompanying requests.

Dated: June 8, 2026                    Respectfully submitted,

/s/ Alicia I. Dearn
4428 Louisiana Ave
Saint Louis, MO 63111
(314) 887-1100
notices@dearnlaw.com

Attorney for Defendants
Libertarian Party of New Mexico,
Chris Luchini, Laura Burrows, Paul
McKenney, Frederick Snoy, and James
Wernicke