IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LIBERTARIAN NATIONAL COMMITTEE,

    Plaintiff,

v.                                                            Civ. No. 1:26-cv-01562-MIS-KK

LIBERTARIAN PARTY OF NEW MEXICO;
CHRIS LUCHINI; LAURA BURROWS; PAUL
MCKENNEY; FREDERICK SNOY; and
JAMES WERNICKE,

    Defendants.

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

THIS MATTER is before the Court on Plaintiff Libertarian National Committee's (LNC) ("Plaintiff") Motion for Preliminary Injunction ("Motion"), ECF No. 10, filed May 29, 2026. On June 7, 2026, Defendants Libertarian Party of New Mexico (LPNM), Laura Burrows, Chris Luchini, Paul McKenney, Frederick Snoy, and James Wernicke ("Defendants"), filed a Memorandum of Opposition ("Response"). ECF No. 16. On June 10, 2026, Plaintiff filed a Reply. ECF No. 18. On June 15, 2026, the Court held a hearing on the Motion. Clerk's Min. of Hr'g of Jun. 15, 2026, ECF No. 24. The Motion is ripe for consideration. Upon review of the Parties' submissions, the record, and the relevant law, the Court will GRANT Plaintiff's Motion.

## I. Background

Plaintiff alleges trademark infringement by Defendants. Compl. at 1, ECF No. 1. Defendant LPNM began affiliating with Plaintiff in 1972, the year both Plaintiff and Defendant LPNM were founded. Mot. at 2-3, ECF No. 10. In 2001, Plaintiff trademarked the term LIBERTARIAN

PARTY ® ("Mark"), Reg. No. 2,423,459, with the United States Patent and Trademark Office. *Id.* at 2. As part of the registration, Plaintiff's use was recognized as starting on January 1, 1972. Trademark Registration at 1-2, ECF No. 1-1.

In August 2022, Defendant LPNM "notified the LNC that it was formally severing its affiliation with the LNC." Mot. at 3, ECF No. 10. In September 2022, Plaintiff LNC "formally disaffiliated with LPNM." *Id.* Defendant LPNM continued to call itself the Libertarian Party of New Mexico, including using the title on their party website, when soliciting political donations, when endorsing candidates and engaging with voters, with the state of New Mexico for elections, and otherwise as one would expect by a political party. *Id.* at 3-5.

Plaintiff sent at least four cease-and-desist letters starting in July 2023, with the most recent letter sent in May 2026. Compl. ¶ 25, ECF No. 1. On May 15, 2026, Plaintiff filed the instant suit, seeking to stop Defendants from continuing to hold themselves out as the Libertarian Party of New Mexico in alleged violation of Plaintiff's trademark. Compl., ECF No. 1. Plaintiff asserts that Defendants' "infringement has caused harm and damage to the LNC and its official affiliate, including monetary harm, political harm, and reputational harm; dilution and disparagement of the LNC's federally registered Trademark and the goodwill associated therewith." *Id.* ¶ 26.

Plaintiff seeks a preliminary injunction to stop Defendants from using "the LNC's federally registered trademark LIBERTARIAN PARTY®" due to the "rapidly approaching nomination and election of federal and state candidates and to preserve public confidence in the electoral process." Mot. at 1-2, ECF No. 10. The deadline to register as a minor party candidate in the state of New Mexico is June 27, 2026. Mot. for Expedited Prelim. Inj. Hr'g at 1, ECF No. 11.

Defendants argue an injunction would impact the rights of non-parties and Plaintiff is pursuing control over "ballot designations and the costs of ballot access" under the guise of

"trademark harm." Resp. at 6, ECF No. 16. Defendants also argue that any preliminary injunction should be under a heightened showing as it would alter the status quo. *Id.* at 5 (citation omitted). Defendants argue Plaintiff is not entitled to a preliminary injunction under a normal or heightened standard because they are unlikely to succeed on the merits, the balance of harm is in Defendants' favor, Plaintiff is not suffering irreparable harm, and the public interest favors Defendants. *Id.* at 7-17. Defendants also request expedited discovery to find evidence about "whether LPNM was ever a licensee, and whether the LNC exercised any control over the use of LIBERTARIAN PARTY® by state and county organizations nationwide." *Id.* at 17.

Plaintiff replies by addressing Defendants' merits arguments and asserts that LPNM was a licensee of the LNC, Reply at 1-3, ECF No. 18, the LNC routinely enforces its rights against infringers, *id.* at 3-4, the Mark is not generic and is deserving of a presumption of validity, *id.* at 4-5, LPNM has not offered any evidence that it is the senior user of the Mark, *id.* at 5-6, LNC has provided a sufficient showing of public confusion, *id.* at 6, and a preliminary injunction will not impermissibly interfere with the upcoming election, *id.* at 7. Plaintiff further argues that a delay will compound ongoing harm to Plaintiff. *Id.* at 7-8. Plaintiff opposes expedited discovery as irrelevant. *Id.* at 8.

## II.  Legal Standard

### A.  Preliminary Injunction

"To prevail on a motion for a preliminary injunction, the movant must establish that four equitable factors weigh in its favor: (1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) its threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to

the public interest." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (citation omitted).

"The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title." 15 U.S.C. § 1116(a). "A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction or upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order." *Id.*

"[T]he following three types of specifically disfavored preliminary injunctions" require a heightened standard

> 'before such an injunction may be issued': (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004), *aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006).

"[C]ourts in this Circuit must recognize that any preliminary injunction fitting within one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id.* "Furthermore, because a historically disfavored preliminary injunction operates outside of the normal parameters for interim relief, movants seeking such an injunction are not entitled to rely

4

on this Circuit's modified-likelihood-of-success-on-the-merits standard." *Id.* at 975-76. "Instead, a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id.* at 976.

## B. Trademark Infringement

"The key inquiry in a trademark infringement case is the likelihood of confusion between two similar marks." *Team Tires Plus, Ltd. v. Tires Plus, Inc.*, 394 F.3d 831, 832 (10th Cir. 2005). "The Lanham Act provides that one party infringes another's trademark when it uses a similar mark in commerce and 'such use is likely to cause confusion.'" *Id.* at 832-33 (citing 15 U.S.C. § 1114). The Tenth Circuit

> has identified six factors that serve as a guide for evaluating the likelihood of confusion:
>
> (a) the degree of similarity between the marks;
> (b) the intent of the alleged infringer in adopting its mark;
> (c) evidence of actual confusion;
> (d) the relation in use and the manner of marketing between the goods or services marketed by the competing parties;
> (e) the degree of care likely to be exercised by purchasers; and
> (f) the strength or weakness of the marks.

*Id.* at 833 (citation omitted). "As with so many of our multi-factor tests, we have emphasized that this list of factors is not exhaustive, that no single factor is dispositive, and that all factors must be considered as an interrelated whole." *Id.* (citation omitted). "At all times, however, 'the key inquiry is whether the consumer is 'likely to be deceived or confused by the similarity of the marks.''" *Id.* (citation omitted).

## III. Discussion

Based on the following, since (1) Plaintiff is substantially likely to succeed on the merits, (2) Plaintiff will suffer irreparable injury if the injunction is denied, (3) Plaintiff's threatened injury

is greater than that of the Defendants under an injunction, and (4) because granting a preliminary injunction is in the public interest and not adverse to it, the Court will grant a preliminary injunction. *Beltronics USA*, 562 F.3d at 1070. Defendants are enjoined from using LIBERTARIAN PARTY® as part of the name of their political party during the pendency of this litigation. Plaintiff is required to post bond in the amount of $20,000. Fed. R. Civ. P. 65(c).

As a preliminary matter, Defendants argue for a period of expedited discovery so they can determine "the existence (or absence) of written licenses and affiliate agreements with, and any quality control over, every state and county Libertarian organization." Resp. at 17, ECF No. 16. Plaintiff argues that the discovery Defendants' seek is irrelevant. Reply at 7-8, ECF No. 18. The Court declines to order expedited discovery. Plaintiff has submitted sufficient evidence to establish their likelihood of success on the merits.

### A. A preliminary injunction is warranted because the factors favor Plaintiff.

"To prevail on a motion for a preliminary injunction, the movant must establish that four equitable factors weigh in its favor: (1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) its threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest." *Beltronics USA*, 562 F.3d at 1070. Each of the factors weighs in favor of Plaintiff.

The Court agrees with Defendants that, since a preliminary injunction would alter the status quo by requiring the Libertarian Party of New Mexico to rebrand itself and, as a result, may require candidates running for office as members of the Libertarian Party of New Mexico to seek office as independents or members of another political party, this analysis is subject to a heightened standard. Resp. at 16, ECF No. 16 (citing *O Centro*, 389 F.3d at 975). The Court therefore "closely

6

scrutinize[s]" the arguments and requires Plaintiff to make a "strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *O Centro*, 389 F.3d at 975-76.

**(1)** ***Plaintiff makes a strong showing that it is substantially likely to succeed on the merits.***

Granting a preliminary injunction that alters the status quo requires Plaintiff to make a strong showing that they are substantially likely to succeed on the merits. *Id.*; *Beltronics USA*, 562 F.3d at 1070. In a trademark infringement case, "[t]he key inquiry . . . is the likelihood of confusion between two similar marks." *Team Tires Plus,* 394 F.3d at 832. There are

six factors that serve as a guide for evaluating the likelihood of confusion:

(a) the degree of similarity between the marks;
(b) the intent of the alleged infringer in adopting its mark;
(c) evidence of actual confusion;
(d) the relation in use and the manner of marketing between the goods or services marketed by the competing parties;
(e) the degree of care likely to be exercised by purchasers; and
(f) the strength or weakness of the marks.

*Id.* at 833 (citation omitted). "[N]o single factor is dispositive, and . . . all factors must be considered as an interrelated whole." *Id.* (citation omitted). "At all times, however, 'the key inquiry is whether the consumer is 'likely to be deceived or confused by the similarity of the marks.''" *Id.* (citation omitted). The Court first addresses merits arguments that do not concern confusion before turning to the key inquiry.

Plaintiff is likely to defeat Defendants' arguments that Defendant LPNM is a senior user of the Mark, that it was never a licensee, that it uses the mark to identify itself and does not use it for affiliation, that the Mark is a generic term, and that Plaintiff abandoned the Mark.

The Lanham Act protects senior users who adopt a mark "without knowledge of the registrant's prior use" and have used such mark continuously since before the mark was registered, published, or used constructively. 15 U.S.C. § 1115(b)(5). The evidence points strongly to the likelihood that LPNM knew full well about the constructive use of the term LIBERTARIAN PARTY® by the LNC at LPNM's founding and that the LPNM established itself as an affiliate of the LNC at its founding.

LPNM insists that because it was founded in July 1972 and was certified by the Secretary of State of New Mexico in August 1972, it is a senior user of the term Libertarian Party. Resp. at 3, 7-8, 10, ECF No. 16. LPNM also insists that LNC has no evidence of national-level connections to New Mexico in 1972. *Id.* at 3. This is strongly refuted by Plaintiff's evidence.

First, establishment at the state level prior to affiliation with the national party is not evidence of prior senior use. There must be some organization at the state level before a state-level group reaches out to the national party to affiliate. And it seems only logical that the state group would adopt a similar title as the national group to facilitate recognition by voters.

Second, LPNM provides no convincing evidence of prior use. The national Libertarian Party was a going concern by early 1972. *See* Libertarian Party Newsletter, January 1972, at 1, ECF No. 1-4. A January 1972 newsletter announced the adoption of the name "Libertarian Party" and the identifying Libersign symbol. *Id.* The trademark registration recognized use of LIBERTARIAN PARTY® starting on January 1, 1972. Trademark Registration at 1-2, ECF No. 1-1.

The symbol is particularly indicative that the LPNM was aware of the Libertarian Party and deliberately affiliated with it in 1972. The Libersign "logo was trademarked [by January 1972]" and the national party announced that it "will be used as an identifying mark by the Party

and its state affiliates." Libertarian Party Newsletter, January 1972, at 1, ECF No. 1-4. The national party newsletter from March 1972 advertises the sale of a "Libersign Pin" and shows it to be an arrow bisecting a horizontal line at an oblique angle. ECF No. 10-1 at 7. The exact same symbol appears on the New Mexico Secretary of State's approval of the "Libertarian Party of New Mexico" filed in August 1972. ECF No. 22 at 4.

Both the sign and use of the term Libertarian Party by the LPNM, therefore, indicate that LPNM did not adopt the term Libertarian Party "without knowledge" of LNC's prior use and therefore was not the senior user of the term Libertarian Party. *See* 15 U.S.C. § 1115(b)(5).

There is also a substantial likelihood that Plaintiff will be able to refute Defendants' argument that it was never a licensee of Plaintiff. Resp. at 4, 9-10, ECF No. 16. First, the evidence cited above strongly supports the conclusion that LPNM affiliated itself with the LNC by adopting the LNC's term and logo. Second, Plaintiff submitted evidence that those state level parties who submitted petitions did so with the knowledge that they were licensing the term "Libertarian Party."

The language in the January 1972 newsletter indicates the national party was focused on linking the national party to state parties. ECF No. 1-4 at 1 ("The logo has been trademarked, and will be used as an identifying mark by the Party and its state affiliates, on literature and on ballots."). And petitions by state organizations submitted in 1977 start with the following language: "We understand that as an affiliate State Libertarian Party we will have the right to use the name Libertarian Party and the Party's symbol and slogan." Wyoming State Petition at 1, ECF No. 18-1. The LNC states that LPNM's original petition was lost in a flood of the LNC archives, Reply at 2, ECF No. 18, but submitted a national Libertarian Party newsletter from November/December 1972 that announced the receipt of an affiliation petition from New Mexico, ECF No. 10-1 at 13

("Affiliation petitions submitted by state LPs in Missouri, and Colorado, Michigan, Minnesota, New Jersey, New Mexico, Ohio and Pennsylvania were accepted, bringing the total of recognized state LP affiliates to 15."). Overall, the evidence indicates a strong likelihood that Plaintiff can show Defendants affiliated themselves with Plaintiff and in so doing recognized they gained the right to use Libertarian Party as an identifier of their affiliation with the national party.

This also supports a likely refutation of Defendants' claims that they use the term to identify themselves and not their affiliation. Resp. at 7-8, ECF No. 16. Defendants argue the use of the term is protected by the First Amendment because it is "not passing itself off as the registrant." *Id.* (citing *Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003)). *Taubman*, however, only clarified that noncommerical use is outside the Lanham Act. *Id.* at 774. When Defendants "used the LNC's trademark to speak *as* the Libertarian Party of [New Mexico], [D]efendants used the mark to designate the source of their political services as affiliated with the LNC, thus implicating 'the core concerns of trademark law' and rendering *Taubman* inapposite." *Libertarian Nat'l Comm., Inc. v. Saliba*, 116 F.4th 530, 535 (6th Cir. 2024). The evidence cited above strongly indicates that use of the Mark was intended to show affiliation. The Court sees no evidence that this affiliation was interrupted between 1972 and 2022. That Defendants disaffiliated in 2022 is not material where the Mark continued to be used in the same manner and indicated affiliation.

Defendants' claim that the term is generic is likely to be defeated as well. Resp. at 12-14, ECF No. 16. While "libertarian" is a political ideology that cannot be trademarked, the use of LIBERTARIAN PARTY® identifies a specific party aligned with this ideology. That was the case in 1972 when the national party adopted the term as an identifier and was recognized by the United States Patent and Trade office when it granted the trademark LIBERTARIAN PARTY® to

10

Plaintiff in 2001. Trademark Registration at 1-2, ECF No. 1-1. ("For: newspapers, brochures, pamphlets and booklets concerning political issues . . . first use 1-0-1972; in commerce 1-0-1972. For: political party services, namely, promoting the interest of a political party . . . first use 1-0-1972; in commerce 1-0-1972."). Furthermore, "once the mark is registered, there is a presumption of validity that requires the party challenging the trademark to produce sufficient evidence to rebut the presumption." *KMMentor, LLC v. Knowledge Mgmt. Pro. Soc., Inc.*, 712 F. Supp. 2d 1222, 1242 (D. Kan. 2010). "This presumption of validity 'has a burden-shifting effect, requiring the party challenging a registered mark to produce sufficient evidence to establish that the mark is generic by a preponderance of the evidence.'" *Id.* (citation omitted). Defendants have provided no evidence that the Mark is generic; they simply argue that all party names containing a political ideology are generic. Resp. at 12-14, ECF No. 16.

The Court also finds Plaintiff has a strong likelihood of success in refuting Defendants' last non-confusion merits argument: that Plaintiff abandoned the Mark through a lack of quality control. Resp. at 10-12, ECF No. 16. Plaintiff argues that, "as a prior licensee," Defendants are "estopped from asserting the defense of a naked license based on facts that occurred while it was a licensee." Reply at 3-4, ECF No. 18 (citing *Henry v. Pro 10 Originals, LLC*, 698 F. Supp. 2d 1279, 1284 (D. Wyo. 2010). As this is a preliminary injunction motion, the Court does not assume that Defendant LPNM was a prior licensee and Defendants are therefore estopped. The evidence, however, strongly indicates that Plaintiff can show it did not abandon the licensee.

Regarding its relationship with the LPNM, there is no evidence that LNC would have had to assert quality control measures against the LPNM during their affiliation between 1972 and 2022. Issues like the endorsement of non-Libertarian Party candidates for President, *see* Libertarian Party of New Mexico Facebook Post at 1, ECF No. 20-6, occurred only after

11

disaffiliation. After disaffiliation, Plaintiff consistently sent cease-and-desist letters to Defendants asking them to stop using the Mark. Compl. ¶ 25, ECF No. 1. Plaintiff began this litigation after those letters failed to achieve their purpose.

Plaintiff also submits evidence of other enforcement actions, including a cease-and-desist letter sent to the Tidewater Libertarian Party in 2021 and a court order in 2023 permanently enjoining it from using LNC registered trademarks. ECF No. 18-2 at 1-6. Furthermore, Plaintiff cites *Saliba*, which concerns an enforcement action taken by the LNC against a splinter group in Michigan impermissibly using the name Libertarian Party of Michigan. 116 F.4th at 532. Plaintiff makes a strong showing that they maintain quality control over the use of their Mark.

The Court now turns to the confusion arguments. Defendants argue that Plaintiff is responsible for creating confusion because they chartered another state-level organization after Defendants disassociated from the LNC. Resp. at 4, ECF No. 16. This is a specious argument. The confusion analysis focuses on the use of the term by the alleged infringer; it does not consider steps taken by the owner of the mark afterwards in attempt to continue its activities. *See Team Tires Plus*, 394 F.3d at 832-33; 15 U.S.C. § 1114(1)(a) (". . . such use [by the alleged infringer] is likely to cause confusion.").

The first of the six Tenth Circuit factors is the degree of similarity between the marks. *Team Tires Plus*, 394 F.3d at 833. Although the Libertarian Party of New Mexico appends the name of the state to the Mark, that is a necessary differentiator between affiliates in different states and the national level Libertarian Party. The Mark is otherwise the same. This factor is strongly in favor of Plaintiff.

The second factor is the intent of the alleged infringer in adopting the mark. *Id.* Here, Defendants did not adopt the Mark, they continued using the Mark to conduct the same activities

12

which they had undertaken prior to disaffiliation, including fund raising, voter outreach, etc. Defendants may not have intended to use the Mark to indicate ongoing affiliation with the National Party, since they did take such steps as changing their logo and posting a disclaimer on their website, Resp. at 15, ECF No. 16, but they have benefited from the public recognition of the Mark as they pursued their political goals. This factor is in favor of Plaintiff.

The third factor is evidence of actual confusion. *Team Tires Plus*, 394 F.3d at 833. Plaintiff submits evidence of actual confusion, including a Facebook post in which a commentator is confused as to why the LPNM is not endorsing the Libertarian Party candidates for President and Vice President, ECF No. 20-6, donor confusion, Decl. of Dereck Scott at 1, ECF No. 10-2, voter confusion, *id.* at 2, member confusion, including attending the wrong state convention, *id.*, prospective member confusion, *id.* at 2-3, general public confusion, *id.* at 3, candidate confusion, *id.*, and media confusion, Tr. of Hr'g of Jun. 15, 2026 at 11[1]; *see also* Decl. of Bret Konsavage at 1-2, ECF No. 10-4.[2] There is strong evidence of actual confusion extending from party members to prospective voters to the general public and this factor is strongly in favor of Plaintiff.

The fourth factor is the relation in use and the manner of marketing between the goods and services marketed by the competing parties. *Team Tires Plus*, 394 F.3d at 833. The Mark is being used identically by the Parties. Both are using it for political party purposes, including voter registration, voter outreach, fundraising, etc. The only dissimilarity is that Plaintiff uses the mark

---

[1]    Neither party ordered the transcript of the June 15, 2026, hearing. The Court cites to the Court reporter's original rough draft of the hearing transcript. Any final transcript may contain slightly different page and/or line numbers.

[2]    Defendants attacked Plaintiff's submitted declarations as hearsay, Resp. at 14, ECF No. 16, but "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).

nation-wide while Defendants use it only within New Mexico. This factor is strongly in favor of Plaintiff.

The fifth factor is the degree of care likely to be exercised by purchasers, *id.*, which the Court understands to mean voters, candidates, donors, and current and prospective members of state-level libertarian parties. The degree of care varies considerably between each group, but in no case is there likely to be such care that a reasonable "purchaser" will always know the difference between the Parties' use of the Mark. Plaintiff provided evidence that even a major state-level donor, herself involved in the founding of the LPNM, was not aware of the rift between LPNM and LNC. Tr. of Hr'g of Jun. 15, 2026 at 13-14. Voters would not be expected to, and should not have to, double-check whether LPNM is an affiliate of LNC when marking a ballot.

Defendants point to their change of logo and the single disclaimer on their website, Resp. at 15, ECF No. 16, but the Court finds that insufficient to overcome confusion over the Mark in this instance. The disclaimer does not seem to appear on every part of the LPNM website, *see* LPNM Donation Page at 1, ECF No. 20-4, uses dark yellow font on a yellow background, is in the same or smaller size font than other writing on the page, and is below two other pop-up boxes on the page, Def.'s Ex. List at 6, ECF No. 22. Although disclaimers can reduce confusion, *see Saliba*, 116 F.4th at 540 (finding a disclaimer effective for online donation solicitation where the pop-up disclaimer explained the dispute between the splinter group and the main affiliate, explained that the LNC recognized the main affiliate and not the splinter group, explained that donations would go only to the splinter group, and included a link to the main affiliate's website), a single disclaimer on one part of the website cannot cure the confusion here, *cf. Univ. of Kansas v. Sinks*, 565 F. Supp. 2d 1216, 1254 (D. Kan. 2008) ("While 'there is a body of academic literature that questions the effectiveness of disclaimers in preventing consumer confusion as to the source of a product,'

14

disclaimers may 'be effective to cure a minimal or moderate amount of confusion.'") (citations omitted).

As to the logo, the Court sees nothing strange in a state-level affiliate having a different logo than a national party and does not believe a logo change would necessarily alert purchasers that the two are not affiliated if they assumed otherwise. This factor is strongly in favor of Plaintiff.

The final factor is the strength or weakness of the marks. *Team Tires Plus*, 394 F.3d at 833. At the state-level it appears that LPNM's continued use of the Mark has made them the preeminent libertarian state party in New Mexico and rendered LNC's affiliate, the Free New Mexico Party, a relative non-entity. *See* Tr. of Hr'g of Jun. 15, 2026 at 24 ("Did any reporter tell you why they wouldn't talk to you?" "Yes" "Okay. What did they tell you?" "That I'm not—that they thought I wasn't part of the Libertarian Party, even though I told them I was."). Therefore, it is a strong and recognizable Mark which helps the LPNM achieve its state-level goals. At the national level, the Mark readily identifies one of the United States' most recognizable "third parties." That the Mark is strong at both the state and national levels increases the likely confusion when people see the Mark used by both the LPNM and LNC and, therefore, this factor is strongly in favor of Plaintiff.

Overall, then, the confusion factors are strongly in favor of Plaintiff. As confusion is the key inquiry in trademark infringement, *Team Tires Plus*, 394 F.3d at 832, and as Plaintiff has the better of Defendants' other merits arguments, the Court finds Plaintiff has established a strong likelihood of success on the merits. This crests the requirements in *O Centro*, 389 F.3d at 975, and *Beltronics USA*, 562 F.3d at 1070, and establishes a "rebuttable presumption of irreparable harm" under the Lanham Act, 15 U.S.C. § 1116(a).

15

### (2) *Plaintiff makes a strong showing that they will suffer irreparable injury if the injunction is denied.*

Granting a preliminary injunction requires Plaintiff to show that it is likely to suffer irreparable harm. *Beltronics USA*, 562 F.3d at 1070; *see O Centro*, 389 F.3d at 975-76. As Plaintiff has shown a strong likelihood of success on the merits, they are entitled to a "rebuttable presumption of irreparable harm" under the Latham Act. 15 U.S.C. § 1116(a).

Plaintiff argues the confusion caused by Defendants' infringement harms them because "voters, party members, potential members, and donors will be confused and lost, possibly forever," and "[v]otes will be lost, vitally necessary fund-raising will continue to be misdirected, and the voters' trust and confidence, not only in the LNC but in politics, will be eroded." Mot. at 10, ECF No. 10. Plaintiff also alleges harm from Defendants' affiliation with "a competing political party and their political positions, political rhetoric and political platforms," *id.*, though LPNM's affiliation with the Liberal Party has apparently ceased for the time being, Tr. of Hr'g of Jun. 15, 2026 at 57.

In response, Defendants offer only that Plaintiff's "own delay—alleging infringement since September 2022 but waiting until 2026 to seek emergency relief—rebuts any claim that the harm is immediate or irreparable." Resp. at 15-16, ECF No. 16 (citing *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543-44 (10th Cir. 1994)). The Court finds this does not overcome the presumption of irreparable injury and that Plaintiff makes a strong showing of irreparable injury.

As in *Kansas Health Care Ass'n*, Plaintiff here has continually pursued resolution of the harm through the issuance of cease-and-desist letters. 31 F.3d at 1544 ("'[P]laintiffs attempted through December 1992 to reach a negotiated settlement of this matter.' Within three months of having failed to reach such a settlement plaintiffs commenced this action. Under those

16

circumstances, we are reluctant to hold that plaintiffs' delay should be fatal to their claim of irreparable injury."); Compl. ¶ 25, ECF No. 1. The Court also does not find a delay of several years before commencing litigation, and attempts to use cease-and-desist letters to restore an affiliate relationship with a state party with which the LNC has had ties since the inception of both, fifty years ago, to be a significant delay. And, as in *Kansas Health Care Ass'n*, "delay does not alter any conclusion" that the action inflicted harm on Plaintiff. 31 F.3d at 1544. Defendants have not overcome the rebuttable presumption of irreparable harm.

Moreover, Plaintiff has shown irreparable harm from voter, member, and donor confusion which impedes Plaintiff's candidates for President and Plaintiff's ability to find members, reach out to voters, and solicit donations. This factor is strongly in favor of Plaintiff.

### (3) *Plaintiff makes a strong showing that its ongoing injury outweighs the injury to Defendants under the injunction.*

Granting a preliminary injunction that alters the status quo requires Plaintiff to make a strong showing that its alleged injury outweighs the injury the opposing party will suffer under the injunction. *O Centro*, 389 F.3d at 975-76; *Beltronics USA*, 562 F.3d at 1070. The Court finds the balance of harms weighs strongly in favor of the Plaintiff.

Plaintiff argues Defendants will not suffer harm because they "can continue to present their opinions in the free and open market of ideas." Mot. at 11, ECF No. 10. Defendants argue the balance of harms are in their favor because of the impact on their organization, Resp. at 16, ECF No. 16, and a preliminary injunction would harm the candidates intending to appear under the Libertarian Party of New Mexico on state ballots, *id.* at 6.

Under an injunction Defendants will be forced to cease using the name Libertarian Party of New Mexico, will have to rebrand its website, and may have to reach out to donors, voters, members, potential members, and the public to explain why they have stopped using the Mark

17

during litigation. Additionally, a preliminary injunction may require candidates running under the LPNM name in this cycle to run as independents or seek the nomination of another party. If elected, however, candidates will still be able to espouse and follow the libertarian views which earned them the nomination of the LPNM.

Plaintiff, if the injunction is not granted, will continue to suffer the above established irreparable harm from voter and donor confusion resulting from Defendants' use of the Mark—harm which Plaintiff has not yet been able to overcome in the last four years despite chartering another affiliate state-level party to represent their interests in New Mexico.

On balance, Defendants' temporary harm is strongly outweighed by the continuing irreparable harm to Plaintiff.

### (4) *Plaintiff makes a strong showing that a preliminary injunction would benefit public interest.*

Finally, granting a preliminary injunction requires Plaintiff to show that the injunction would not be adverse to public interest. *Beltronics USA*, 562 F.3d at 1070; *see O Centro*, 389 F.3d at 975-76. Plaintiff shows that a preliminary injunction would benefit public interest.

Plaintiff argues that the public interest is served by "enjoining splinter or former affiliated groups from using marks in a way that suggests authorization or affiliation." Mot. at 11-12, ECF No. 10 (citations omitted). Plaintiff argues that a preliminary injunction would not interfere with state elections since the New Mexico Secretary of State would not be bound by a preliminary injunction. Reply at 7, ECF No. 18.

Defendants argue the "public interest in orderly elections and in the free functioning of political association outweighs the LNC's interest in monopolizing a political label." Resp. at 16-17, ECF No. 16. Defendants argue that the public interest will be adversely affected by the potential "voiding [of] a ballot designation that registered New Mexico voters rely upon." *Id.* at

18

16-17 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006)). Defendants also cite to *Republican National Committee v. Democratic National Committee*, 589 U.S. 423, 424 (2020), for the argument that "[c]ourt changes of election laws close in time to the election are strongly disfavored." Resp. at 8, ECF No. 16. The Court finds *Purcell* and *Republican National Committee* do not apply and the public would benefit from an injunction.

In *Republican National Committee*, the Supreme Court issued its decision one day before Wisconsin's primary election. 589 U.S. at 423. Here, there is no impending election. There is an impending candidate registration deadline, but, as Defendant Luchini explained, Tr. of Hr'g of Jun. 15, 2026 at 69, LPNM is involved in elections every year and the Court expects that no matter when a preliminary injunction is issued, it would inevitably affect some aspect of candidate registration or voting. There is also no guarantee that a preliminary injunction will impact candidates or the registration deadline and thereby deprive the public of their ability to vote for libertarian candidates affiliated with LPNM. Candidates may register as independents or seek other nominations.

*Purcell* is simply inapplicable. *Purcell* dealt not with the candidates which would appear on the ballot, but instead whether voters would be able to vote without presenting identification on election day, which, at the time of the Court of Appeals' decision, was just "weeks" away. 549 U.S. at 2-4.

The Court agrees with Plaintiff that there is an inherent public interest in ensuring political candidates presented to the public are presented accurately and transparently regarding their affiliations.

"'Public interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused.'" *Big O Tires, Inc. v. Bigfoot*

19

*4X4, Inc.*, 167 F. Supp. 2d 1216, 1228 (D. Colo. 2001) (quoting *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990)). Plaintiff has already established that there is a strong likelihood of confusion. *Supra* III.B.1. A preliminary injunction would temporarily stop the use of the allegedly infringing term and thereby make transparent that LPNM and LNC are not affiliated, lessening confusion by, and thereby benefiting, the public. *Big O Tires*, 167 F. Supp. 2d at 1228; *Opticians Ass'n of Am.*, 920 F.2d at 198; *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986) ("[T]he public interest is especially served by issuing a preliminary injunction against a former licensee as the licensee's status increases the probability of consumer confusion . . . the use of a mark by a former licensee confuses and defrauds the public."). This factor is strongly in favor of Plaintiff.

As all four preliminary injunction factors are in favor of Plaintiff, and Plaintiff has made a sufficiently strong showing on those factors requiring one when issuing a preliminary injunction altering the status quo, the Court will grant Plaintiff's Motion and issue a preliminary injunction enjoining Defendants from using the Mark LIBERTARIAN PARTY®. Defendants may continue referring to themselves as libertarians in the sense that they believe in the libertarian political philosophy.

**B. The Court will grant a bond of $20,000 in accordance with Fed. R. of Civ. P. 65(c).**

Under Federal Rule of Civil Procedure 65(c), the court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

Defendants requested a $100,000 bond to cover the costs of "ballot access . . . fundraising, trust assets, the cost of rebranding, . . . fundraising goodwill, costs, interests, cost of suit, and just the loss of volunteers, [and] membership." Tr. of Hr'g of Jun. 15, 2026 at 84. Plaintiff did not offer

a specific amount but argued $100,000 seems "excessively high" since the bond in *Saliba* was $20,000. *Id.* at 87-88.

If Defendants are enjoined or restrained wrongfully, they will have to rebrand their website and pay to reach back out to donors, voters, and the public whom they interacted with during the enjoinment. Defendants place this cost at $100,000. *Id.* at 84. But in discussing the bond amount, Defendant's counsel seemed to be considering the cost of rebranding LPNM permanently as a different political party. *Id.* Furthermore, much of LPNM's actions appear to be undertaken by volunteers. The Court therefore finds that $100,000 bond is excessive and a $20,000 is enough to cover the "costs and damages" sustained by Defendants should this injunction be found to have been wrongfully issued.

## IV. Conclusion

In summary, Plaintiff has established that the four equitable factors supporting a preliminary injunction in these circumstances are in its favor. For the foregoing reasons, **IT IS HEREBY ORDERED** that

1. Plaintiff's Motion for a Preliminary Injunction is **GRANTED**;

2. Defendants **SHALL NOT** use Plaintiff's Mark, LIBERTARIAN PARTY®, including the name "Libertarian Party of New Mexico," during the pendency of this lawsuit;

3. This injunction includes, but it not limited to, removing the Mark from their website, use of the Mark when interacting with members, voters, and the public, or when endorsing or otherwise interacting with candidates, and use of the Mark in any other forum that would create confusion as to whether they are affiliated with the Libertarian National Committee or the national Libertarian Party; and

4.  Plaintiff **SHALL** transfer to the Clerk of Court a bond in the amount of $20,000 within seven (7) days of the issuance of this order.


**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE